UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:

                                         Case No. 17-40590-nhl

Rakesh K. Chadha,

                                         Chapter 7

                        Debtor.
-------------------------------------------------------------x
Itria Ventures LLC,

                        Plaintiff              Adv. Pro. No. 17-01043-nhl

                v.

Rakesh K. Chadha,

                        Defendant.
-------------------------------------------------------------x

## DECISION AND ORDER AFTER TRIAL

APPEARANCES:

Edward Weissman, Esq.
Jan Marcantonio, Esq.
Law Office of Edward Weissman
60 East 42nd Street, Suite 557
New York, NY 10165
*Attorneys for the Plaintiff*

Dennis J. O'Sullivan, Esq.
Law Office of Dennis J. O'Sullivan
210-13-35th Avenue
Bayside, NY 11361
*Attorney for the Defendant*

NANCY HERSHEY LORD
UNITED STATES BANKRUPTCY JUDGE

Before this Court is an adversary proceeding commenced by plaintiff Itria Ventures LLC ("Itria" or the "Plaintiff"), seeking a determination that the debt owed by the debtor and defendant herein, Rakesh K. Chadha ("Chadha," the "Debtor," or the "Defendant"), is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2) or, alternatively, seeking to bar the Debtor's discharge pursuant to 11 U.S.C. § 727(a).[1]

The Court held a trial on this matter. As explained fully below, the Court finds that Itria failed to establish by a preponderance of the evidence that the Debtor obtained monies from Itria by means of false pretenses; false representations; actual fraud; the use of fraudulent written statements; or through the falsification of financial documents. Consequently, the debt owed to Itria may not be excepted from discharge pursuant to § 523(a)(2), nor is there a basis to deny the Debtor's discharge pursuant to § 727(a).

## JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(1), and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The following are the Court's findings of fact and conclusions of law to the extent required by Rule 52 of the Federal Rules of Civil Procedure, as made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

---

[1] 11 U.S.C. §§ 101 *et seq.* may be referred to throughout as the "Code." References to "§ _____" are to sections in the Code unless otherwise specified.

**FACTS**

The facts of this case were developed at trial through the testimony of four witnesses, Ramit Arora, Manprit Chawla, Dev M. Kini, and the Debtor, and certain exhibits admitted into evidence. Following trial, the parties submitted post-trial statements.

Itria is a corporation that provides financing to small businesses. Trial Tr. vol. 1, 17, Feb. 22, 2018. It has been in operation for four years and its President, Ramit Arora ("Arora"), oversees the business's day-to-day operations and performs underwriting functions. Tr. vol. 1, 17–18. Biz2Credit, a company associated with Itria, received and reviewed financial documentation for Itria. Trial Tr. vol. 2, 14–15, Mar. 9, 2018.

The Debtor is a restaurant entrepreneur with professional experience in the hotel and restaurant industries dating back to 1986. Tr. vol. 2, 50–51. The Debtor, through various corporations, operated three eateries in the Roosevelt Field Mall (the "Mall") until February or March of 2017. Tr. vol. 2, 52–53. Two of them—Preesha Operating Corp. d/b/a Ranch One ("Ranch One"), which opened in 1996, and Café Spice Roosevelt Field Mall, LLC d/b/a Café Spice ("Café Spice"), which began operations in 2004—were located in the in the Mall's food court. Tr. vol. 2. 52–53. The third, Viva Roosevelt Field Mall, LLC d/b/a La Bottega ("La Bottega," and, together with Ranch One and Café Spice, the "Restaurants") began operating in 2008 as a full-service restaurant and bar, occupying a stand-alone space of approximately 4,400 square feet. Tr. vol. 2, 53.

In 2015, the Debtor began discussions with Simon Properties, the Mall owner and the Restaurants' landlord (the "Landlord"), for an extension of La Bottega's lease, which was set to expire in June of 2016. Tr. vol. 2, 54, 86. As a condition for a ten-year renewal, the Debtor was required to give La Bottega a "facelift," which entailed, *inter alia*, the installation of new

equipment, furniture, updated signage, digital menus, and an outside kiosk. Tr. vol. 2, 54–55; *see also* Def.'s Ex. 4. By the end of 2015, the Debtor retained architect Martin A. Passante to design floorplans for La Bottega's facelift. Tr. vol. 2, 57; Def.'s Ex. 1. Passante produced initial designs on November 16, 2015 and revised designs on June 26, 2016, for which he was paid $5,000. Tr. vol. 2, 58; Def.'s Ex. 1. Additionally, in March and April of 2016, the Debtor received price quotes in the amounts of $55,699.89 and $29,789.93, respectively, for restaurant equipment from City Restaurant Supplies. Def.'s Ex. 2. Finally, in July of 2016, the Debtor received price quotes for new signage in the amounts of $13,594.42 and $15,169.48. Def.'s Ex. 3. Between May and October of 2016, the Debtor was in contact with Kristen Harris, an employee of the Landlord who served as the Senior Tenant Coordinator at the Mall, to seek approval of Passante's designs and to coordinate renovations. Def.'s Ex. 4. La Bottega's lease was ultimately renewed for a ten-year term in June of 2016. Tr. vol. 2, 54.

The Debtor approached Itria, in either November or December of 2015, to obtain working capital for the Restaurants. Tr. vol. 1, 19–20; Tr. vol. 2, 63–64. After meeting with Arora, the Debtor was assigned to case manager Summit Arora ("Summit") at Biz2Credit, who was charged with overseeing the Debtor's request. Tr. vol. 2, 63–64. Summit emailed the Debtor on December 18, 2015, instructing him to submit the application for financing together with various supporting documentation. Def.'s Ex. 5. Shortly thereafter, the Debtor forwarded this email to his bookkeeper, Manprit Chawla ("Chawla"), and instructed him to complete the application and transmit it together with the documents, all of which were in Chawla's possession or available to him. Tr. vol. 2, 12–16, 64–65; Def.'s Ex. 5.  The Debtor did not directly transmit any of the requested documents to Itria or Biz2Credit, "as Mr. Chawla was in direct communication with their case manager, Sumit Aurora [*sic*]." Tr. vol. 2, 65. Chawla, who

3

had provided bookkeeping services for the Debtor since November of 1996 by creating profit

and loss statements for the Restaurants using QuickBooks software, then transmitted the

application together with the requested documents to Biz2Credit. Tr. vol. 2, 8, 10, 14–16.

Itria and Biz2Credit used the information provided by Chawla to create an underwriting

file (the "Underwriting File") for the purpose of evaluating the Debtor's application. Tr. vol. 1,

23–24; Pl.'s Ex. A. The Underwriting File contained the following financial documentation: (1)

partnership tax returns pertaining to Café Spice, showing losses of $595 in 2013 and $1,311 in

2014, together with attachments demonstrating that "RSC Group Inc" and "Sushil Malhotra"

each owned 50% interests in the entity; (2) Schedule C attachments to the Debtor's individual

tax returns pertaining to La Bottega and showing losses of $6,029 in 2013 and profits of $10,793

in 2014; (3) balance sheets for La Bottega for 2013 and 2014; (4) a corporate tax return for

Ranch One showing losses of $74,980 in 2014; (5) merchant processing statements for the

Restaurants; (6) bank statements for the Restaurants; (7) UCC financing statements for the

Restaurants; and (8) a report based on a site visit to the Mall conducted by Biz2Credit. Pl.'s Ex.

A; Tr. vol. 1, 23–25. Arora personally reviewed and relied upon the Underwriting File when

determining whether to advance monies. Tr. vol. 1, 25, 27. Based on the tax documents relating

to the Restaurants, Arora concluded that La Bottega's "revenue was pretty stable," Café Spice

"was doing pretty well and . . . was growing," and Ranch One had "revenue . . . close to about

$1,300,000." Tr. vol. 1, 25–27. After reviewing the bank statements and the merchant processing

statements, Arora determined that the Restaurants were "doing well" and "processing a decent

amount of transactions . . . ." Tr. vol. 1, 28. Based on Biz2Credit's site visit to the Mall, Arora

thought that the Restaurants were "in a busy mall . . . doing well . . . in a good location and . . .

[appeared to be] legitimate . . . ." Tr. vol. 1, 29–30. After speaking with the Debtor and

evaluating the Underwriting File, Itria "determined that [it] c[ould] advance funds to . . . the three restaurants." Tr. vol. 1, 30.

On April 1, 2016, the Debtor received an email from Summit, together with a proposed future receivables sales agreement pursuant to which Itria would provide $350,000 in working capital. Def.'s Ex. 7; Tr. vol. 2, 66–67. The Debtor rejected this proposal because he believed the Restaurants needed less money and the "money was not cheap, it was 13 percent interest on it." Tr. vol. 2, 67–68. The Debtor instead sought $150,000 from Itria. Tr. vol. 2, 67–68.

Several days thereafter, the Restaurants and Itria came to an agreement and, on April 4, 2016, executed a contract titled "Future Receivables Sale Agreement" (the "April FRSA"), providing that Itria would purchase $208,500.00 in future receivables from the Restaurants in exchange for a payment of $150,000.00 upon execution of the agreement. Pl.'s Ex. B, Art. 2. In addition, the Restaurants were required to tender weekly payments to Itria equal to four percent of the amount of future receivables purchased or, alternatively, $1,447.92. Pl.'s Ex. B. Further, the Restaurants warranted that the funds received from Itria would be used "solely for general working capital purposes in Merchant's business, and for no other purpose"; that all financial information provided to Itria was "true and correct"; that they were "financially solvent"; that "all material information and documents" had been disclosed; and that they would "promptly notify [Itria] of the occurrence of any material breach, or if . . . [a] material breach may be likely to occur, or if . . . any representation or warranty . . . is no longer true and correct or is likely not to be true and correct." Pl.'s Ex. B, Art. 9. The Debtor personally guaranteed the April FRSA and, as part of the guaranty, "reaffirm[ed] all representations and warranties" contained therein. Pl.'s Ex. B, Art. 20. Additionally, the Debtor executed an Affidavit of Confession of Judgment.

Pl.'s Ex. B. The obligations arising from the April FRSA are not at issue in this adversary proceeding.

Between June and August of 2016, the Debtor testified that he detected a "downtrend of the [M]all," a "drop in [] foot traffic," and noticed an increase in store closings at the Mall. Tr. vol. 2, 79, 83, 87–88. However, "the [M]all went through a major renovation at that time," which the Debtor believed was the cause of these conditions. Tr. vol. 2, 79–80, 83. The Debtor ultimately concluded "it was not that significant [of a] drop" because the Restaurants were earning enough to fulfill their financial obligations, including those owed to Itria. Tr. vol. 2, 88–90. Consequently, he did not report the decrease in foot traffic and increased store closings to Itria at that time. Tr. vol. 2, 88–89.

As plans for La Bottega's facelift continued to develop, the Debtor emailed Summit at Biz2Credit on August 1, 2016 to obtain additional funds. Pl.'s Ex. C. The Debtor specifically requested "$150000.00 more funding for remodeling of our restaurant La Bottega . . . ." Pl.'s Ex. C. In his request, the Debtor also stated, "Please check our file and let us know what more documents required [*sic*]. Chawla [] will send them to you . . . ." Pl.'s Ex. C. Before advancing the additional funds, Itria requested "financial statements . . . the profit and loss statements for all the three restaurants for 2015. . . bank statements and . . . merchant processing statements . . . ." Tr. vol. 1, at 35. In response, Chawla provided Biz2Credit profit and loss statements for the Restaurants for 2015 (the "2015 P&L Statements"), a balance sheet and income statement for La Bottega for 2015, and bank statements for La Bottega and Ranch One. Tr. vol. 2, 15–17; Pl.'s Ex. D. The 2015 P&L Statements showed profits in the amount $1,453.48 for Café Spice, $30,575.22 for Ranch One, and $24,739.24 for La Bottega. Pl.'s Ex. D. On August 10, 2016, Itria, the Restaurants, and an additional entity owned by the Debtor named Preesha Operating

6

Corp. d/b/a OSM Deli & Grill, executed a second Future Receivables Sale Agreement (the "August FRSA"). Pl.'s Ex. E. The August FRSA was also personally guaranteed by the Debtor. Pl.'s Ex. E, Art. 20. The August FRSA was identical to the April FRSA in all material respects and included the same set of warranties, which were "reaffirm[ed]" by the Debtor by way of the personal guaranty language. *Compare* Pl.'s Ex. E, *with* Pl.'s Ex. B.

Two weeks *after* executing the August FRSA and advancing the funds, Summit contacted the Debtor requesting copies of the Restaurants' rent checks for the previous three months, 2015 business tax returns, and two trade references. Def.'s Ex. 6. Chawla responded by providing everything requested except for the Restaurants' 2015 business tax returns. Tr. vol. 2, 65. Those had not yet been completed because the Restaurants' certified public accountant, Dev M. Kini ("Kini"), had filed for an extension as was his typical practice. Tr. vol. 2, 29–30. Consequently, the Restaurants' 2015 business tax returns were not completed and filed until mid-September of 2016. Tr. vol. 2, 29–30.

In October of 2016, the Debtor received approval from the Landlord to move ahead with La Bottega's facelift, but still needed "the final sign-off on the drawings" to proceed with construction. Tr. vol. 2, 87. Additionally, the holiday season was fast approaching, which was the Restaurants' "main time to have [their] revenue come in." Tr. vol. 2, 87. Hopeful of a "good Christmas season" and lacking approval of the final designs for La Bottega, the Debtor decided to hold-off on the restaurant renovation until January of 2017. Tr. vol. 2, 80, 87, 98. However, upon review of La Bottega's revenue in January of 2017, which reflected a far less profitable holiday season than anticipated, the Debtor recognized that continued operation of La Bottega was not viable. Tr. vol. 2, 80, 85, 87, 98. Shortly thereafter, the Debtor concluded that the Restaurants could no longer sustain making payments under the April FRSA or the August

FRSA. Tr. vol. 2, 99. Additionally, the Debtor noticed a more drastic decrease in foot traffic "after the holiday season." Tr. vol. 2, 90. At that point, the Debtor informed Itria of the Restaurants' inability to make the regularly scheduled payments due to declining sales. Tr. vol. 1, 99. The Debtor went to Itria's offices and proposed alternative payment arrangements, such as going to family and friends to raise money. Tr. vol. 2, 99. The Debtor believed that he could close La Bottega, but still "make [a] living from" Café Spice and Ranch One while eventually paying Itria back. Tr. vol. 2, 99. However, an agreement could not be reached. Tr. vol. 2, 99. With the funds remaining in the Restaurants' operating accounts, the Debtor paid $99,000 to Itria and used the rest to cover operating expenses. Tr. vol. 2, 101.

On February 5, 2017, the Debtor closed La Bottega. Tr. vol. 2, 83. The Debtor filed an individual bankruptcy petition under chapter 7 of the Bankruptcy Code on February 10, 2017, scheduling his indebtedness to Itria arising from the guarantee. Pl.'s Ex. J. It is the discharge of the Debtor's guaranty obligation under the August FRSA which is in dispute.

## LAW

One of the "fundamental objective[s] of the bankruptcy law is to afford a deserving debtor an economic rehabilitation or 'fresh start' in life." *In re Bodenstein*, 168 B.R. 23, 27 (Bankr. E.D.N.Y. 1994). The fresh start policy is, however, "tempered by an equally important objective and that is to prevent the 'dishonest debtor's attempt to use the law's protection to shield his or her wrongdoing.'" *Id.* (citing *In re Newmark*, 20 B.R. 842, 852 (Bankr. E.D.N.Y. 1982)). Accordingly, a chapter 7 debtor will be granted a discharge pursuant to § 727(a), unless a trustee or a creditor successfully objects by proving one of the specific grounds for denial of discharge. 11 U.S.C. § 727(a)(1)–(12). In addition, § 523(a) provides a creditor a separate avenue for excluding a specific debt from the debtor's general discharge if the creditor can establish

8

certain requisite elements. 11 U.S.C. § 523(a)(1)–(19); *compare* 11 U.S.C. § 727(a), *with* 11 U.S.C. § 523(a).

When assessing objections to dischargeability and discharge pursuant to §§ 523(a) and 727(a), respectively, "courts adhere to certain guiding principles . . . ." *Bodenstein*, 168 B.R. at 27. Notably, exceptions to discharge pursuant to § 523(a) and objections to discharge pursuant to § 727(a) should be "literally and strictly construed against the creditor and liberally and in favor of the debtor." *Id.* Objections pursuant to § 523(a) and § 727(a) are forms of alternative relief that exist independent of one another, and thus should be analyzed separately. *See In re Haas*, 273 B.R. 45, 50 (Bankr. S.D.N.Y. 2002) ("There is no impropriety in a creditor seeking alternate relief under both Sections 523(a) and 727(a) in an adversary proceeding."). When proceeding under § 727(a) or 523(a), a party must prove the elements of its claim by a preponderance of the evidence. *Sarasota CCM, Inc. v. Kuncman*, 466 B.R. 590, 595–96 (Bankr. E.D.N.Y. 2012) (citing *Grogan v. Garner*, 498 U.S. 279, 286 (1991)); *In re Gardner*, 384 B.R. 654, 662 (Bankr. S.D.N.Y. 2008)).

### NON-DISCHARGEABILITY UNDER § 523(a)(2)

Section 523(a)(2) provides, in pertinent part:

A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or] (B) use of a statement in writing—(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C. § 523(a)(2)(A)–(B).

Section 523(a)(2)(A) "gives creditors an opportunity to prove that particular debts arose through impermissible means, and advances the cornerstone bankruptcy principle that relief

befall only the debtor with clean hands." *In re Luthra* 182 B.R. 88, 91 (Bankr. E.D.N.Y. 1995)

(citing *Local Loan Co.*, 292 U.S. 234, 244 (1934)). Courts have held that:

> to prevail on a Section 523(a)(2)(A) claim, a creditor must establish five elements: first, that the debtor made a false representation; second, that the debtor knew the representation was false at the time it was made; third, that the debtor made the false representation with the intent to deceive the creditor; fourth, that the creditor justifiably relied on the representation; and finally, that the creditor sustained a loss that was proximately caused by the false representation.

*In re Moses*, 547 B.R. 21, 35 (Bankr. E.D.N.Y. 2016); *see also In re Suarez*, 367 B.R. 332, 338

(Bankr. E.D.N.Y. 2007). "A misrepresentation is fraudulent if the maker . . . knows or believes . .

. the matter is *not* as represented, or does not have the confidence in the accuracy of his

representation as stated or implied, or knows . . . he does *not* have the basis for his representation

as stated or implied . . . ." *In re Suarez*, 367 B.R. at 340 (emphasis in original) (internal

quotations omitted). "Conscious deception and concealment of material information may

constitute false pretenses under § 523(a)(2)(A)." *In re Khafaga*, 419 B.R. 539, 546 (Bankr.

E.D.N.Y. 2009); *see also In re Boyard*, 538 B.R. 645, 653–54 (Bankr. E.D.N.Y. 2015)

(providing that a failure to disclose relevant information may constitute misrepresentation under

§ 523(a)(2)(A) if falsity and intent to deceive are also present). Section 523(a)(2)(A) does not

require "a statement in writing," so debts obtained through non-written misrepresentations may

be excepted under this provision. *Moses*, 547 B.R. at 35.

 In contrast, an objection made pursuant to § 523(a)(2)(B) must be based on a written

statement. A plaintiff "need not prove that the writing constituting the false statement was

entirely completed by [the] Debtor[]. It is sufficient that [a] [d]ebtor[] either wrote, signed, or

adopted such statement to find that the documents were 'written' by them." *In re Cedillo*, 573

B.R. 405, 421 (Bankr. E.D.N.Y. 2017) (citing 11 U.S.C. § 523(a)(2)(B)). A written statement is

materially false if it "paints a substantially untruthful picture of the debtor's financial condition

by misrepresenting information of the type which would normally affect the decision to grant credit." *In re Boice*, 149 B.R. 40, 45 (Bankr. S.D.N.Y. 1992) (internal quotations omitted). "As the Second Circuit has stated, '[i]n determining whether a statement relates to a debtor's financial condition, courts agree the term is not limited to formal financial statements.'" *Cedillo*, 573 B.R. at 421 (citing *In re Bogdanovich*, 292 F.3d 104, 112 (2d Cir. 2002)). Whether the creditor reasonably relied on the false written statement is judged by "[a]n objective standard by which . . . 'reasonableness' requires that representations must be found to be of such a character that a reasonably prudent person would rely on them." *Id.* (citing *In re Magnusson*, 14 B.R. 662, 668 n.1 (Bankr. N.D.N.Y. 1981)). Finally, the debtor's intent "may be inferred when the totality of the circumstances depicts deceptive conduct by the debtor." *In re Boice*, 149 B.R. at 47.

### DENIAL OF DISCHARGE PURSUANT TO § 727(a)

In its Complaint, Itria cited § 727(a)(1), (2), and (3) as grounds for denying the Debtor's entire discharge. Compl. ¶ 10.  The Court finds that § 727(a)(1) is wholly inapplicable because it denies a discharge to a debtor that is not an individual. 11 U.S.C. § 727(a)(1).

Section 727(a)(3) provides for a denial of discharge where the debtor "failed to preserve any recorded information . . . from which the debtor's financial condition or business transactions might be ascertained . . . ." 11 U.S.C. § 727(a)(3). The purpose of § 727(a)(3) is to "ensure[] that 'creditors are supplied with dependable information on which they can rely in tracing a debtor's financial history.'" *In re Cacioli*, 463 F.3d 229, 234 (2d Cir. 2006) (quoting *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992)). Itria does not allege that the Debtor "failed to preserve any recorded information" such that the Debtor's financial condition could not be ascertained post-petition. Instead, Itria alleges that prior to any bankruptcy filing,

the Debtor misrepresented the financial health of the Restaurants. Accordingly, § 727(a)(3) is also inapplicable.

> Section 727(a)(2) precludes discharge where:
>
> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
> > (A) property of the debtor, within one year before the date of the filing of the petition; or
> > (B) property of the estate, after the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2). When asked at the outset of trial the basis under which it was seeking to deny the Debtor's discharge pursuant to § 727(a), Itria responded, "727 for concealing information and providing information that is improper, falsified." Tr. vol. 1, 7. While this subsection speaks to concealment, it, like subsection 3, centers on a debtor's alleged wrongdoing in or in connection with the bankruptcy case and applies specifically to alleged concealment of property of the debtor, within one year before the bankruptcy filing or property of the estate, after the bankruptcy filing. Therefore, this subsection of § 727 is inapplicable as well. In any event, Itria appears to have abandoned this claim as § 727(a)(2) was neither pursued during trial nor raised in Itria's post-trial statement.[2] *See* Pl.'s Post-Trial Statement.

## ANALYSIS

### ITRIA'S FIVE ALLEGATIONS IN SUPPORT OF ITS CLAIMS

Without specifying the claim to which each allegation applies, Itria makes five allegations that purport to form the basis for its objection to the dischargeability of its debt pursuant to § 523(a)(2). First, Itria alleges that the Debtor was aware that the Restaurants were experiencing a downturn in business as far back as June of 2016, but did not notify Itria (the

---

[2] In fact, Itria did not discuss § 727 *at all* in its post-trial statement. (Pl.'s Post-Trial Statement.)

"Economic Downturn Allegation"). Pl.'s Post-Trial Statement 1–2. Second, Itria alleges that the

Debtor did not disclose that he was having a dispute with the Landlord (the "Landlord Dispute

Allegation"). Tr. vol. 1, 8. Third, Itria contends that the 2015 P&L Statements produced by

Chawla on or around August 1, 2016, as part of the request for additional funds, were "bogus,"

inaccurate, and misleading (the "Inaccurate Profit and Loss Statements Allegation"). Pl.'s Post-

Trial Statement 3. Fourth, Itria alleges that the 2013 and 2014 tax returns for La Bottega and

Café Spice provided to it in 2016 were never filed (the "Unfiled Tax Returns Allegation"). Tr.

vol. 1, 7. Fifth and finally, Itria alleges that the Debtor represented in email correspondence that

the monies advanced by Itria would be used for the remodeling of La Bottega and the Debtor's

failure to use the funds for that purpose constitutes fraud (the "Misuse of Funds Allegation"). Tr.

vol. 1, 7. According to Itria, these five purported omissions and misrepresentations fraudulently

induced Itria to provide an additional $150,000 to the Restaurants through the August FRSA.

Pl.'s Post-Trial Statement 3; Tr. vol. 1, 7–8. Furthermore, Itria argues that, because Article 8 of

both the April FRSA and August FRSA required the Debtor to "promptly notify [Itria] . . . if [the

Debtor] ha[d] reason to believe that any representation or warranty . . . [wa]s no longer true and

correct or likely not to be true or correct," the debt owed to it by the Debtor should be excepted

from discharge pursuant to § 523(a)(2). Pl.'s Post-Trial Statement 1; Pl.'s Exs. B, E.

### THE ECONOMIC DOWNTURN ALLEGATION

Itria asserts that the Debtor "became aware of a downturn in business as far back as June

2016, but . . . remained silent about the downturn despite the continued contractual duty to

disclose" it. Pl.'s Post-Trial Statement 2. In essence, Itria asserts that by failing to disclose a

perceived slowdown, the Debtor falsely represented the economic condition of the Restaurants.

While the Debtor admitted to recognizing a "downtrend" in the middle of 2016 and not

disclosing this to Itria until after the holiday season concluded in January of 2017, he explained that, initially, this slowdown was "not that significant [of a] drop. It was a trend dropping down, it was not that significant that I could not pay [Itria's] weekly payments." Tr. vol. 2, 79, 88–90. The Debtor also explained that this was a "downtrend of the [M]all" due to a decrease in foot traffic, which he attributed to the fact that "the [M]all went through a major renovation at that time," and did not believe any slowdown was unique or exclusive to the Restaurants. Tr. vol. 2, 79–80. Additionally, it was not until after the 2016 holiday season that the Debtor "really [] saw the foot[] [traffic] drop down," at which point he alerted Itria of the situation. Tr. vol. 2, 90–91.

In essence, the Debtor's perception of the slowdown—that Itria contends he was obligated to disclose pursuant to Article 8 of both the April FRSA and August FRSA—was nothing more than an anecdotal observation about the general economic climate of the Mall. In the Debtor's mind, it was not a specific indication of a material or significant downtrend in the Restaurants' business that affected their ability to pay Itria. Based on the Restaurants' continuing ability to meet its financial obligations to Itria and others, the unscientific nature of the Debtor's observations, and the fact that the Debtor genuinely believed that the Mall's own renovations caused the slowdown, the Debtor's silence was reasonable and did not constitute a fraudulent misrepresentation regarding the economic viability or solvency of the Restaurants. As a result, Itria has not established that the Debtor intended to deceive it by waiting until January of 2017 to disclose his observations about the economic conditions of the Mall and the Restaurants. Consequently, the Economic Downturn Allegation cannot form the basis for a § 523(a)(2)(A) exception.

## THE LANDLORD DISPUTE ALLEGATION

Itria also asserts that the Debtor's failure to disclose problems with the Restaurants' Landlord forms the basis for non-dischargeability of its debt under § 523(a)(2)(A). At trial, Arora testified that "location is the most important thing . . . if you're in a dispute with the landlord and if you don't know that you'll be able to stay in that place of business, then it brings into question the viability of the business." Tr. vol. 1, 21. In support of the Landlord Dispute Allegation, Arora testified that he first learned of a dispute between the Debtor and the Landlord during a meeting at Itria's offices in January of 2017. Tr. vol. 1, 39–40. According to Arora, the Debtor stated that this dispute had been ongoing for "more than six months." Tr. vol. 1, at 40. Arora did not testify to any details about the alleged dispute beyond this reported conversation. *See* Tr. vol. 1, 39–41.

The Debtor testified that while the lease for La Bottega was set to expire in 2016, he and the Landlord began "talking about an extension of the lease in 2015 for a ten-year term, but [he] had to put a facelift . . . [on] the restaurant . . . [as] one of the conditions, and they gave the extension for ten years in June 2016." Tr. vol. 2, 54. Emails exchanged between the Debtor and Harris, the Senior Tenant Coordinator at the Mall, spanning from May 12, 2016 to October 3, 2016, demonstrate that the Debtor was actively working towards satisfying the "facelift" lease renewal condition. Def.'s Ex. 4. Other emails exchanged between the Debtor and Isaac Goldring at City Restaurant Supplies on March 3, 2016 and April 7, 2016, contain price quotes for restaurant equipment and design plans for a new kiosk to be built in La Bottega. Def.'s Ex. 2. The Debtor also received price quotes for new signage to be constructed at La Bottega. Def.'s Ex. 3. The Debtor retained an architect to design new floor plans for La Bottega, which are attached to an email between the Debtor and Passante dated June 26, 2016. Def.'s Ex. 1. While the Debtor had approached the Landlord in January of 2017 to seek a rent reduction due to the

Restaurants' unexpectedly bad holiday season, there is no testimony that they were involved in a dispute or that a dispute ensued. Tr. vol. 2, 85–86. When asked, "when you were approaching the [L]andlord, did you have any historical dispute with the [L]andlord?" the Debtor answered, "No, none so ever [*sic*]." Tr. vol. 2, 86.

Neither the Debtor's credible testimony nor the documentary evidence admitted at trial support a finding that the Debtor was having a dispute with the Landlord. To the contrary, the evidence indicates that the Debtor was actively working with the Landlord, vendors, and professionals to satisfy the "facelift" lease renewal condition and, in fact, the lease was ultimately renewed on or around June 26, 2016. Tr. vol. 2, 58. Even if, *arguendo*, the Debtor's asking for a rent reduction qualified as a "dispute," it occurred long after the execution of the August FRSA and was disclosed to Itria shortly after its occurrence in January of 2017. Tr. vol. 1, 39–40. Finally, Itria's Landlord Dispute Allegation is vague in that it provides no details beyond the assertion of its alleged occurrence. Thus, the Court finds that there was nothing for the Debtor to disclose and no "false representation" regarding the Restaurants' ability to remain in their Mall locations because of a Landlord dispute. Accordingly, the Landlord Dispute Allegation cannot serve as a basis for a § 523(a)(2)(A) exception to discharge.

### THE INACCURATE PROFIT AND LOSS STATEMENTS ALLEGATION

Itria contends that the 2015 P&L Statements provided by the Debtor and Chawla showed that the Restaurants were performing well when they were not. Pl.'s Post-Trial Statement 5; Pl.'s Ex. D. It argues that the 2015 P&L Statements were materially false and were provided to Itria with intent to deceive and, in fact, did deceive Itria by causing it to advance an additional $150,000 under the August FRSA. Pl.'s Post-Trial Statement 5. While the 2015 P&L Statements undoubtedly constitute a statement in writing respecting the debtor or an insider's financial

condition, Itria failed to prove by a preponderance of the evidence that they were caused to be made or published by the Debtor with intent to deceive.

The testimony of Chawla and Kini shed considerable light on the 2015 P&L Statements. As described above, the 2015 P&L Statements provided to Itria showed positive net income for the Restaurants as follows: $1,453.48 for Café Spice; $30,575.22 for Ranch One; and $24,739.24 for La Bottega. Pl.'s Ex. D. Chawla testified that he prepared the Restaurants' profit and loss statements using Quickbooks and based those calculations on invoices, operating reports, and bank statements provided by the managers of the Restaurants. Tr. vol 2., 10–13. Essentially, he was computing them on a "cash basis." Tr. vol. 2, 30. According to Kini's testimony, cash-basis profit and loss statements incorporate "whatever money comes in, [and whatever] money goes out," and this accounting method was used for each of the Restaurants. Tr. vol. 2, 30. Kini explained,

> [W]hen the bookkeeper does the bookkeeping, he enters all the expenses and income based on whatever money comes in and goes out, but there are instances where some of the bills are not entered into the computer for the month of December, sometimes we pay that in January and February. Those actually occurred as an accrual basis, they belong as an expenses [*sic*] for the prior year. So I reclassify them[.]

Tr. vol. 2, 28–29. Kini testified that he "reclassif[ied]" the 2015 P&L Statements provided by Chawla and "adjust[ed] for any accruals," including payables for December of 2015, thereby creating the final profit and loss statements upon which the Restaurants' tax returns were based. Tr. vol. 2, 29–30. This was not extraordinary, as each year Chawla would provide the cash-basis profit and loss statements to Kini who in turn adjusted them for accruals when filing the Restaurants' taxes. Tr. vol. 2, 16. According to Kini, "there's always a little bit of difference between the financials and the tax return." Tr. vol. 2, 36. Kini also testified that he normally seeks an extension for filing the Restaurants' tax returns and did so in 2016, meaning that the due

date was September 15, 2016. Tr. vol. 2, at 29. For that reason, he did not adjust the 2015 P&L Statements until "the end of August [or] early September . . . ." Tr. vol. 2, at 32. Kini testified that he had no knowledge that the cash-basis 2015 P&L Statements were being submitted to Itria and didn't see them before they were sent. Tr. vol. 2, 31–32.

The testimony at trial also makes plain that the Debtor was uninvolved in creating the 2015 P&L Statements. Chawla testified that he created the 2015 P&L Statements and then showed them to the Debtor. Tr. vol. 2, 15. The Debtor testified that he did not review the 2015 P&L Statements before they were provided to Itria by Chawla, did not create or maintain them, and possesses only a basic understanding of how they are computed. Tr. vol. 2, 75–76. The Debtor also testified that each week Chawla "picked up all the documents, sales receipts, invoices, and . . . bank statements for his data to be entered into the Quickbooks program." Tr. vol. 2, 76–77. Additionally, the Debtor testified that Chawla did this work on his personal computer and that the Debtor did not have access to that computer. Tr. vol. 2, 76. Finally, Chawla testified that it was he who sent the 2015 P&L Statements directly to Biz2Credit. Tr. vol. 2, 14.

Itria was only able to produce evidence at trial showing a discrepancy between Ranch One's 2015 profit and loss statement, which showed a profit of $30,575.22, and that entity's 2015 tax return, which showed a loss of $31,798. *Compare* Pl.'s Ex. D, *with* Pl.'s Ex. H. Kini's testimony explains this discrepancy as the consequence of his adjusting Chawla's cash-basis 2015 P&L Statements to an accrual basis for the purpose of filing the entities' taxes. Tr. vol. 2, 29–30.

This credible explanation, together with the Debtor's lack of knowledge about and involvement in calculating the 2015 P&L Statements, demonstrates to the Court that the Debtor

did not intend to deceive Itria when he caused Chawla to provide it with the profit and loss statements prepared and maintained by Chawla. For these reasons, the Inaccurate Profit and Loss Statements Allegation cannot provide a basis for a § 523(a)(2)(B) exception.

## THE UNFILED TAX RETURNS ALLEGATION

Itria alleges that the 2013 and 2014 tax returns for La Bottega and Café Spice were never filed, while the Debtor misrepresented to it that they were. Tr. vol. 1, 7, 46; *see* Pl.'s Ex. A. In support of its allegation, Itria provided Tax Guard reports and tax transcripts indicating that tax returns for those limited liability companies ("LLCs") were "unfiled." Pl.'s Ex. H. At trial, however, Kini testified that returns were in fact filed as attachments to the tax returns of another entity. Tr. vol. 2, 27–28, 32–33; Def.'s Am. Post-Trial Statement, May 6, 2018. Specifically, Kini explained that the Internal Revenue Service's ("IRS") tax treatment of those LLCs as "disregarded entit[ies]" allowed their tax information to be piggybacked and reported as part of the Debtor's personal tax return. Tr. vol. 2, 27–28, 32–33. Kini explained the term "piggybacking" as "when single member shareholders, LLC, or any LLC . . . is filed on [an] individual's return rather than the tax return for that company." Tr. vol. 2, 32–33. That is precisely what happened here.

Moreover, the 2013 and 2014 tax information for La Bottega and Café Spice was not concealed. La Bottega's tax information for those years was provided to Itria for inclusion in the Underwriting File as "Profit or Loss from Business" Schedule C attachments to the Debtor's individual tax returns. Pl.'s Ex. A. Similarly, the 2013 and 2014 tax information for Café Spice was given to Itria and included in the Underwriting File as IRS Form 1065. Pl.'s Ex. A. These forms reflected Café Spice's negative income and identified those members to whom its losses would pass through. Pl.'s Ex. A.

Because the nuances of La Bottega and Café Spice's tax information were abundantly clear from the time they were produced and made part of Itria's Underwriting File, the Debtor made no misrepresentation regarding the tax returns. Accordingly, Itria's § 523(a)(2)(A) claim with respect to the Unfiled Tax Returns Allegation fails.

### THE MISUSE OF FUNDS ALLEGATION

Finally, Itria alleges that the Debtor represented in email correspondence that the monies advanced by Itria would be used for the remodeling of La Bottega, and the Debtor's failure to use the funds for that purpose constituted fraud. In support of its allegation, Itria points to email correspondence from the Debtor, dated August 1, 2016, that reads, "As per our conversation last week, I need $150000.00 more funding for remodeling of our restaurant La Bottega. Please check our file and let us know what more documents required. Chawla [] will send them to you. Most of papers you should have in file." Pl.'s Ex. C. While this email indeed suggests that the additional $150,000 obtained through the August FRSA would be used for remodeling La Bottega, this stated use was not incorporated into the August FRSA. *See* Pl.'s Ex. E. Instead, Article 9 of the August FRSA, like Article 9 of the April FRSA, specifically and expressly obligated the Restaurants to use the funds advanced "solely for general working capital purposes . . . and for no other purpose." Pl.'s Ex. E, Art. 9. Additionally, the August FRSA contained an integration clause at Article 19. Pl.'s Ex. E, Art. 19. Accordingly, whether the Debtor initially sought the funds for remodeling purposes is irrelevant because the subsequently entered into August FRSA, which represents the entirety of Itria and the Restaurants' agreement by virtue of its integration clause, states that the $150,000 advanced pursuant thereto was specifically to be used for "general working capital purposes." Pl.'s Ex. E, Art. 9. Thus, Itria cannot successfully maintain that the Debtor committed fraud or fraudulently misrepresented that the funds advanced

pursuant to the August FRSA would be used for remodeling purposes when Itria's own document mandated different requirements for use. Consequently, the Misuse of Funds Allegation does not provide a basis for exception to discharge pursuant to § 523(a)(2)(B).

## CONCLUSION

For these reasons, the Court finds that Itria has failed to meet its burden in proving false pretenses; false representations; actual fraud; use of fraudulent written statements; and the falsification of financial documents to obtain monies pursuant to the August FRSA. Because § 727(a) is inapplicable to bar the Debtor's discharge and the debt owed Itria is not excepted from the Debtor's discharge pursuant to § 523(a)(2), the Debtor's discharge shall be granted and shall include the discharge of the August FRSA guaranty obligation.

**IT IS SO ORDERED.**



**Dated: March 30, 2019**
**Brooklyn, New York**

_Nancy Hershey Lord_
**Nancy Hershey Lord**
**United States Bankruptcy Judge**